1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9             **SOUTHERN DISTRICT OF CALIFORNIA**
10
11   ALVIN A. WILLIAMS-COOK,                    **CASE NO. 09-CV-2643-H (AJB)**
12                         Petitioner,          **ORDER DENYING PETITION**
                                                **FOR WRIT OF HABEAS**
13        vs.                                   **CORPUS**

     JAMES A. YATES, Warden,
14
                         Respondent.
15
16
17

18        On November 20, 2009, Alvin Williams-Cook ("Petitioner"), a state prisoner
19   proceeding *pro se* and *in forma pauperis*, filed a petition for a writ of habeas corpus pursuant
20   to 28 U.S.C. § 2254 challenging his conviction for second degree murder.  (Doc. No. 1.)
21   Respondent filed a response on May 3, 2010, and Petitioner filed a traverse on June 28, 2010.
22   (Doc. Nos. 13, 19.)   On July 14, 2010, the Magistrate Judge issued a report and
23   recommendation ("R&R") to deny and dismiss the petition.  (Doc. No. 20.)  On August 19,
24   2010, Petitioner filed an objection to the R&R.  (Doc. No. 22.)
25        After due consideration, the Court DENIES the petition for writ of habeas corpus.
26   ///
27   ///
28   ///

## BACKGROUND

### I.    Factual History

Federal habeas courts presume the correctness of a state court's determination of factual issues unless Petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  The court of appeal summarized the relevant facts as follows:

> In early December 2004, Williams began staying in the home of his uncle, Alvin Davis. On the morning of December 4, Williams was arrested after he aggressively confronted other people at a shopping center and acted uncooperatively towards officers who responded to a call for assistance. After he was placed in a patrol car, Williams repeatedly said that it was "judgment day" and that it was "his time to die." Based on Williams's erratic behavior, police took him to a county mental health facility for evaluation. After his admission, Williams gave a urine sample that later tested positive for the presence of methamphetamines, cocaine and marijuana.
>
> Late in the evening of that same day, San Diego police officers found Davis's dead body, face down, in a hallway of his home; Davis's pants were pulled down slightly below his knees, although they were still fastened in the front and zipped, his face had a blood trail that ran from his nose to his ear despite the face-down position of the body, his back had an unexplained abrasion, and the tip of his nose had a rug burn. There was blood near the body and on the living room carpet some distance away, the telephone line had been disconnected, and the bedroom near the body was in disarray.
>
> The forensic pathologist who examined the body found numerous injuries to Davis's head, including hemorrhaging and bruising of both eyes, swelling of the lips, a large, deep hemorrhage on the left cheek, an even larger hemorrhage on the top left side, and two bruises on the right side, one on the forehead and one on the upper back of the scalp. The body also had substantial bruising on both sides of the neck that was consistent with strangulation and bruises on the right arm, shoulder and armpit. The pathologist opined that the death was a homicide, resulting from "blunt force head and neck injuries" followed by cardiac arrest, and that Davis had been dead for at least 24 hours.

///

///

///

///

///

///

Police detectives interviewed Williams on December 5 after he was discharged from the mental health facility. Williams expressed surprise when the detective told him of Davis's death and indicated that Davis had been at home, alive, when he left the home and that he had not been back since then. He told the officers that Davis had allowed him to take one of Davis's cars so that he could go to the store, but that he had driven it around town, to visit friends and family, instead. During the interview, Williams expressed frustration that the police had not spoken to him earlier about Davis's death and referred to the fact that Davis had "[gotten] killed," although the detective had previously told him that the cause of death was unknown. Williams also acknowledged to the officers that Davis had been "a very sick man."

One of the detectives noticed some blood on the back of Williams's shirt and on one of Williams's shoes and asked to keep Williams's clothing for investigative purposes. Williams indicated that the blood could not have been his uncle's and agreed to turn over his clothing. DNA tests indicated that Davis was the "most likely" source of bloodstains that were found on the right front pocket of Williams's vest, on the ankle and heel areas of one of Williams's socks and on the inside of one of Williams's shoes.

Although Williams consistently maintained that he had nothing to do with Davis's death, he was ultimately arrested and charged with murder. At his first trial, the court declared a mistrial after the jury was unable to reach a unanimous verdict.

On retrial, the prosecution sought to establish that Williams was guilty of first degree murder on a felony murder theory (premised on the contention that Williams caused Davis's death during the commission of a carjacking). It introduced evidence of the facts described above, as well as evidence that Davis was very overweight, had high blood pressure and an enlarged heart, had had a kidney transplant and a knee replacement within the year preceding his death and was taking multiple medications, including a blood thinner. Various witnesses also testified that Davis was very protective of his cars and rarely allowed anyone else to drive them, and his girlfriend testified that he had indicated he was not going to let Williams take his car on the evening in question.

The primary focus of the defense was establishing that Davis's injuries could have resulted from a fall rather than from a physical attack by another person. For example, defense counsel cross-examined the forensic pathologist at length regarding the nature of the injuries, particularly the absence of any subdural hematomas or any fracture in the larynx and the fact that the injuries were largely to soft tissue. He also elicited testimony that Davis's medical condition or medications might have made him prone to having nose bleeds or susceptible to more extensive bruising and presented a defense forensic expert who testified that none of the bloodstains on Williams's clothes or in various places in the house were impact blood spatters. In closing arguments, defense counsel contended that Williams and Davis were close, that Williams had no motive to kill Davis, that there was no evidence that Williams showed physical signs of having been involved in an assault on Davis (who was a black belt in karate) and that Davis's death resulted from natural causes rather than an assault.

09cv2643

1
2
3

> The court instructed the jury on felony murder, second degree murder, voluntary manslaughter, involuntary manslaughter and carjacking. The jury acquitted Williams of first degree murder and carjacking, but convicted him of second degree murder.

(Notice of Lodgment ("Lodgment") 5 at 2-5.)

4
5

## II.    Procedural History

On December 14, 2006, Petitioner was convicted of second degree murder in violation of California Penal Code ("Penal Code") section 187(a).  (Lodgment 2.)  On March 6, 2007, Petitioner was sentenced to an indeterminate prison term of eighteen years to life based on his second degree murder conviction and three prior prison terms.  (Lodgment 3.)

On December 1, 2007, Petitioner filed his opening brief challenging his conviction on appeal.  (Lodgment 4.)  On November 13, 2008, the court of appeal affirmed Petitioner's conviction and sentence.  (Lodgment 5.)  Petitioner filed a petition for review in the California Supreme Court on December 15, 2008.  (Lodgment 6.)  On January 21, 2009, the California Supreme Court denied his petition for review.  (Lodgment 20.)

On April 24, 2009, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court arguing that his trial defense counsel was ineffective.  (Lodgment 7.)  That petition was denied on October 14, 2009.  (Lodgment 21.)  On November 20, 2009, Petitioner filed the instant petition for a writ of habeas corpus.

## DISCUSSION

## I.    Scope of Review

The district court "shall make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   28 U.S.C. § 636(b)(1). Petitioner objects to the R&R.  (Doc. No. 22.)  Therefore, the Court will make a de novo determination of all sections of the R&R.

///

///

///

Federal habeas petitions filed after April 24, 1996, are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See 28 U.S.C. § 2254(d); Lindh v. Murphy, 521 U.S. 320, 326-27 (1997).  The AEDPA provides the following standard of review applicable to state court decisions:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA establishes a "highly deferential standard for evaluating state-court rulings," requiring that "state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  A state court's decision is "contrary" to clearly established federal law if it applies a rule that contradicts governing Supreme Court authority, or it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and reaches a different result.  Early v. Packer, 537 U.S. 3, 8 (2002).  Clearly established federal law refers to the holdings, not the dicta, of Supreme Court decisions at the time of the relevant state court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000).  A state court's application of federal law is "unreasonable" only if it is "objectively unreasonable."  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).  An "incorrect or erroneous" application is insufficient.  Id.  A state court's adjudication rests on an unreasonable determination of the facts if the state court's factual findings are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  The state court's factual determinations are presumed to be correct and Petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

In determining whether a state court decision is contrary to federal law, the Court looks to the state's last reasoned decision.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

1    Where there is no reasoned decision from the state's highest court, the Court "looks through"

2    to the underlying appellate court decision and presumes that the unexplained opinion rests

3    upon the same ground.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

4    **II.    Insufficient Evidence Claim**

5         Petitioner argues that his conviction for second degree murder violated his due process

6    rights because there was insufficient evidence of implied malice, which is an essential element

7    of second degree murder.  (Doc. No. 1 at 6.)  He maintains that the evidence presented at trial

8    failed to show that Petitioner had any knowledge regarding the victim's heart condition.  (Id.)

9    He also argues that he actually believed the victim to be healthy, because the victim had been

10   cleared to undergo two major surgeries in the months before his death. (Id.)

11        Under the Due Process clause of the Fourteenth Amendment, a criminal defendant may

12   only be convicted "upon proof beyond a reasonable doubt of every fact necessary to constitute

13   the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The standard

14   regarding sufficiency of evidence is "whether, after viewing the evidence in the light most

15   favorable to the prosecution, *any* rational trier of fact could have found the essential elements

16   of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979)

17   (emphasis in original).  When "no rational trier of fact could have found proof of guilt beyond

18   a reasonable doubt," the petitioner is entitled to habeas corpus relief. Id. at 324.  "The question

19   is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational

20   jurors could have reached the same conclusion that these jurors reached."  Roehler v. Borg,

21   945 F.2d 303, 306 (9th Cir. 1991).  The prosecution is not required to "rule out every

22   hypothesis except that of guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 326.  Rather,

23   if any conflicting inferences arise, the reviewing court will assign the inference that favors the

24   prosecution.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  Thus, when challenging

25   the sufficiency of evidence for a state law conviction on federal due process grounds, a

26   petitioner faces a heavy burden.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

27        Under California law, second degree murder is "the unlawful killing of a human being

28   with malice aforethought but without the additional elements, such as willfulness,

premeditation, and deliberation that would support a conviction for first degree murder." People v. Knoller, 41 Cal. 4th 139, 151 (2007). "[M]alice may be express or implied. It is express when there is manifested intention to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." Cal. Penal Code § 188. Second degree murder based on implied malice "requires proof that a defendant acted with conscious disregard of the danger to human life." Knoller, 41 Cal. 4th at 156. It is not necessary to prove that the defendant was aware that his conduct had a "high probability of resulting in death." Id.

Because the California Supreme Court denied the petition without comment or citation, the Court "looks through" to the underlying appellate court decision and presumes that the unexplained opinion rests upon the same ground. See Ylst, 501 U.S. at 801-06. The evidence at trial showed that Petitioner had a long-time relationship with the victim, was staying in the victim's house, knew the victim was overweight, had high blood pressure, had a kidney transplant and that he gave himself injections and pills. (Lodgment 5 at 10-11.) Petitioner also admitted to the detectives that the victim was "a very sick man." (Id.)

Petitioner knew about Davis' multitude of medical problems. As Petitioner specifically notes in his petition, Davis had been cleared for two major surgeries in the year leading up to his death. (Doc. No. 1 at 6.) Davis had a kidney transplant in January 2004. (Lodgment 9 at 284.) In November 2004, less than a month before his death, Davis also had a total knee replacement. (Lodgment 10 at 364.) Davis had to use a cane after his knee surgery. (Lodgment 11 at 547.) There were railings in his bathroom to help him use the facilities. (Lodgment 9 at 318.) Contrary to Petitioner's suggestion, clearance for two major surgeries in the same year does not indicate good health under these facts in the record. Petitioner acknowledged that the victim was not a healthy man. (Lodgment 5 at 10-11.)

At trial, the prosecution introduced evidence to show that the victim died of sudden cardiac death as a result of being beaten and choked. (Lodgment 12 at 815.) His body exhibited signs of being beaten including: blood on his face and hand, swollen eyes, and an

1  abrasion on his nose.  (Id. at 818.)  The bleeding in the victim's eyes was consistent with either

2  blunt force trauma or neck compression.  (Id. at 836.)

3      The record includes sufficient evidence for a jury to conclude that Petitioner acted with

4  a conscious disregard of the danger of his actions to human life.  A rational trier of fact could

5  find the essential elements of second degree murder beyond a reasonable doubt.  See Jackson,

6  443 U.S. at 319.  Therefore, the evidence presented at trial to the state court jury was sufficient

7  to convict Petitioner of second degree murder.

8  **III.  Trial Court Jury Instruction Error Claim**

9      Petitioner argues that the trial court erred in failing to completely instruct the jury on

10  an involuntary manslaughter instruction.  (Doc. No. 1 at 7.)  He explains that the jury may have

11  felt compelled to convict Petitioner of second degree murder rather than acquit him due to a

12  partial omission in the jury instruction defining involuntary manslaughter.  (Id.)  The relevant

13  jury instruction is Cal. Crim. No. 580.  The trial court gave the following jury instruction and

14  omitted the underlined portion:

15      When a person commits an unlawful killing without malice aforethought and
        does not intend to kill and also does not act with conscious disregard for human
16      life, then the crime is involuntary manslaughter.

17      The difference between other homicide offenses and involuntary manslaughter
        depends on whether the person was aware of the risk to life that his or her
18      actions created and consciously disregarded that risk. An unlawful killing caused
        by a willful act done with full knowledge and awareness that the person is
19      endangering the life of another and done in conscious disregard of that risk is
        either voluntary manslaughter or second-degree murder. An unlawful killing
20      resulting in a willful act committed without an intent to kill and without
        conscious disregard of the risk to human life is involuntary manslaughter.

21      The defendant also committed involuntary manslaughter if:
22      1. The Defendant (committed a crime that posed a high risk of death or great
        bodily injury because of the way in which it was committed) [or] committed a
23      lawful act but acted with criminal negligence; and
        2. The Defendant's act unlawfully caused the death of another person.
24
    (Lodgment 18 at 1614-15.)
25
        The Supreme Court has never decided whether a defendant in a non-capital case is
26
    entitled to a lesser included offense instruction and expressly declined to answer the question
27
    in Beck v. Alabama, 447 U.S. 625, 633 n.8 (1980).  The Ninth Circuit has declined to extend
28

the right to have the jury instructed on a lesser included offense to non-capital defendants. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).  A failure by a state court to include a lesser included offense instruction "does not present a federal constitutional question."  Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998).  When there is no Supreme Court precedent that clearly establishes federal law on the legal issue in question, "the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).  Because there is no clearly established federal law regarding any requirement of lesser included offense instruction in a non-capital case, Petitioner's claim is not cognizable.

However, even if petitioner had stated a cognizable claim, his argument would fail.  The question for whether a collateral attack can be sustained on an erroneous instruction is whether the omitted instruction "so infected the entire trial that the resulting conviction violates due process."  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  This is a heavy burden where a petitioner must show "that the violation had a substantial and injurious effect on the jury's deliberation and verdict."  Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004) (citation omitted).  The court of appeal issued the last reasoned state court decision on November 13, 2008. (Lodgment 5.)  It held that the omission was not prejudicial error.  (Id. at 9.)  Because the court had actually instructed the jury on voluntary manslaughter or second degree murder and involuntary manslaughter, the jury was not faced with an all-or-nothing choice of conviction or acquittal.  (Id.)  The jury found that Petitioner had acted with implied malice, which meant that there was no reasonable probability that the jury would have convicted Petitioner of involuntary manslaughter even if the omitted section of the lesser included offense instruction had been given.  (Id.)

The Court agrees.  The jury necessarily found that Petitioner had acted with implied malice for the second degree murder conviction.  Petitioner must demonstrate "actual prejudice" from the alleged trial error and has failed to do so.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Even if the trial court erred in its omission of a portion of the jury instruction, the error was harmless.  Thus, the state court's decision was not contrary to or an

1   unreasonable application of clearly established federal law, as determined by the Supreme

2   Court.  See 28 U.S.C. § 2254.

3   **IV.    Ineffective Assistance of Counsel Claim**

4          Petitioner also argues that his defense counsel was ineffective due to the failure of

5   defense counsel to object to the jury instruction.  (Doc. No. 1 at 7.)  He claims that the jury

6   may have felt obligated to convict him of second degree murder rather than acquit him.  (Id.)

7          To make a claim for ineffective assistance of counsel, a habeas petitioner must meet

8   both of the requirements established in Strickland v. Washington, 466 U.S. 668 (1984).  First,

9   the counsel's performance must have been deficient.  Id. at 687.  To meet this requirement, the

10  errors made by counsel must have been "so serious that counsel was not functioning as the

11  'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Second, this deficient

12  performance must have prejudiced the defense.  Id.  The errors made by counsel must have

13  been serious enough to have deprived the defendant of a fair trial.  Id. at 687.  To show

14  prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's

15  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

16  review of counsel's performance is based on an objective standard of reasonableness.  Id. at

17  688.  This review is "highly deferential and there is a strong presumption that counsel's

18  conduct fell within the wide range of reasonable representation."  United States v. Ferreira-

19  Alameda, 815 F.2d 1251, 1253 (9th Cir. 1987).  If a petitioner fails to meet either requirement,

20  the ineffectiveness claim is defeated.  Strickland, 466 U.S. at 700.

21         Based on the record, Petitioner cannot show that the jury would have returned a

22  different verdict had counsel objected to a portion of the instruction.  Petitioner cannot meet

23  the requirements of Strickland, and, therefore, his claim for ineffective assistance of counsel

24  fails.  See id.

25  ///

26  ///

27  ///

28  ///

## CONCLUSION

For the reasons state above, the Court DENIES Petitioner's petition for writ of habeas corpus.  The Court also denies a certificate of appealability.

**IT IS SO ORDERED.**

DATED: September 21, 2010

_____

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:

All parties of record.